UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TORI BELLE COSMETICS LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>CYNTHIA MCKNIGHT, *et al.*,<br><br>    Defendants. | Cause No. C21-0145RSL<br><br>ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS |

This matter comes before the Court on "Defendants' Motion to Dismiss for Failure to State a Claim." Dkt. # 26. Plaintiff sells cosmetics and false eyelashes through a network of salespeople it calls "Affiliates." The Affiliates recruit additional Affiliates, earning a portion of the proceeds from a recruit's sales and forming a branching sales team. Plaintiff alleges that four of its former Affiliates are using or have used the trade secrets and social media channels they had developed while they were Tori Belle Affiliates to attract sales people and customers for the benefit of a competing venture, Globallee Inc. Plaintiff asserts claims of breach of contract (Count I), tortious interference with contract or prospective business expectancy (Count II), conversion (Count III), violation of the Defend Trade Secrets Act (Count IV), civil conspiracy (Count V), and violation of the duty of good faith and fair dealing (Count VI). Defendants seek dismissal of all of plaintiff's claims with prejudice.

ORDER - 1

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the context of a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996).

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." []*Twombly*, 550 U.S. [at 570]. A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *U.S. v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the pleading standards of Rule 8(a)(2), a party must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). . . . A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

*Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1144-45 (9th Cir. 2021). If the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim, dismissal is appropriate. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

ORDER - 2

**A. Breach of Contract (Count I)**

Plaintiff alleges that individuals interested in becoming a Tori Belle Affiliate must complete an online process and agree to certain terms governing the relationship between Tori Belle and its Affiliates. Dkt. # 23 at ¶ 48. The four former Affiliates named as defendants in this matter all completed the on-line process in 2019. Dkt. # 23 at ¶¶ 51-54.

The governing contracts contain a number of promises and provisions. Plaintiff alleges material breaches of Sections 2.13, 5.4, and 11 of the "Policies and Procedures of the Tori Belle Independent Affiliate Agreement." Dkt. # 29 at 11.[1] Defendants challenge the viability of plaintiff's breach of contract claims, arguing that the nonsolicitation provision is not enforceable under Washington law, that plaintiff failed to adequately allege the disclosure of any confidential information, and that the nondisparagement provision does not apply post-termination and/or has not been breached.

**1. Nonsolicitation**

Section 5.4 of the Affiliate agreement precludes an Affiliate from recruiting any Tori Belle Affiliate or customer to participate in another direct sales or network marketing opportunity. Dkt. # 23-3 at 32; Dkt. # 23-4 at 31-32. The prohibition applies during the term of the agreement and for some period of months after its termination. *Id.*  Although Washington

---

[1] There are two versions of the Affiliate Agreement at issue in this case, one of which was in effect at the time defendant McKnight ceased working for Tori Belle (Exhibit C to the Second Amended Complaint, Dkt. # 23-3) and one of which was in effect at the time defendants Miraya, Yocum, and Burdine severed their relationships with Tori Belle (Exhibit D to the Second Amended Complaint, Dkt. # 23-4). The Court refers to the two versions of the Affiliate Agreement in the singular unless there is a substantive distinction between them.

ORDER - 3

law makes noncompetition provisions void and unenforceable against an independent contractor unless he or she earns more than $250,000 per year (RCW 49.62.030(1)), "the non-compete statute explicitly excludes non-solicitation agreements from its strict enforceability requirements." *A Place for Mom v. Perkins*, 475 F. Supp.3d 1217, 1230 (W.D. Wash. 2020); RCW 49.62.010(4) ("'Noncompetition covenant' includes every written or oral covenant . . . by which an employee or independent contractor is prohibited or restrained from engaging in a lawful profession, trade, or business of any kind. A 'noncompetition covenant' does not include: (a) A nonsolicitation agreement . . . ."). Defendants Miraya, Yocom, and Burdine nevertheless argue that the nonsolicitation covenant at issue here is not enforceable as to them[2] because it does not fall within the statutory definition of "nonsolicitation agreement."

RCW 49.62.010(5) defines a "nonsolicitation agreement" as "an agreement between an employer and employee that prohibits solicitation by an employee, upon termination of employment: (a) Of any employee of the employer to leave the employer; or (b) of any customer of the employer to cease or reduce the extent to which it is doing business with the employer." Because Affiliates are independent contractors, defendants argue that there is no agreement between an employer and employee and that plaintiff cannot plausibly accuse the Affiliates of soliciting "employees" or customers of an "employer." Defendants therefore conclude that the nonsolicitation provision at issue here falls within the general definition of "noncompetition"

---

[2] Plaintiff alleges that defendant McKnight earned more than $250,000 a year (Dkt. # 23 at ¶ 68), and McKnight does not dispute that she is bound by the nonsolicitation provision.

ORDER - 4

under RCW 49.62.010(4) and is unenforceable unless the independent contractor earns more than $250,000 per year..

Neither party cites, and the Court has not found, any case or legislative history that discusses this issue. Plaintiff alleges that RCW 49.17.020(4) and (5) provide the applicable definitions for the terms "employer" and "employee" and that those definitions clearly encompass independent contractors. Dkt. # 23 at ¶ 74. Although an assertion regarding statutory interpretation and applicability is a legal conclusion that is "not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 680, plaintiff is correct. The noncompetition statute expressly states that "'[e]mployee' and 'employer' have the same meanings as in RCW 49.17.020." RCW 49.62.010(2). Those definitions include in the term "employer" any business entity that contracts with one or more persons for personal labor and include in the term "employee" a person who is working under an independent contract. RCW 49.17.020(4) and (5). Thus the plain language of the statute's nonsolicitation carveout and the relevant definitions shows that nonsolicitation agreements are enforceable as to both employees and independent contractors. *Whatcom Cnty. v. City of Bellingham*, 128 Wn.2d 537, 546 (1996) ("When the statute's meaning is plain on its face, we give effect to the plain meaning of the statute as an expression of legislative intent.") (citation omitted). This construction is also consistent with the legislative findings "that workforce mobility is important to economic growth and development" and "that agreements limiting competition or hiring" may be unreasonable. RCW 49.62.005. The legislature's goal of ensuring that Washington laborers have the flexibility to change jobs (or are substantially compensated if they give up that flexibility) is accomplished through the

ORDER - 5

imposition of restrictions on noncompete provisions regardless whether the laborer is labeled an "employee" or an "independent contractor."

In the alternative, defendants argue that Section 5.4 of the Affiliate Agreement is a nonsolicitation clause in name only and/or that plaintiff has not adequately alleged a breach. Defendants assert that Section 5.4 in fact bars former Affiliates from working for any other direct sales company. The contractual language belies this argument, however: "Affiliates are free to participate in other direct sales, social selling, multilevel or network marketing business ventures or marketing opportunities," but they "may not recruit any Tori Belle Affiliate" or customer to enroll or participate in such ventures or opportunities. Dkt. # 23-3 at 32; Dkt. # 23-4 at 31-32. This is a classic nonsolicitation provision.

With regards to the adequacy of plaintiff's allegations, plaintiff alleges that defendant McKnight reached out to other Tori Belle Affiliates, feigning ignorance as to why her Affiliate Agreement with Tori Belle had been terminated in the hopes of creating a sense of insecurity that would prompt the Affiliates to resign and cease doing business with Tori Belle. Dkt. # 23 at ¶ 101. McKnight allegedly used a private Facebook group she administered to inform group members, most of whom were Tori Belle Affiliates, that she would likely remain in the industry and they should connect with her at the email she provided. Dkt. # 23 at ¶ 102. McKnight, Miraya, Yocom, and Burdine coordinated social media publications at the end of January 2021 that made clear that they were involved in an as-yet unannounced business venture. Dkt. # 23 at ¶¶ 103-11 and 114. Once the new venture was up and running, McKnight congratulated former Tori Belle Affiliates on their success with Globallee, highlighting successes, bonuses, and

ORDER - 6

promotions. Dkt. # 23 at ¶ 122. These publications were directed through channels that had previously been used to promote Tori Belle's business and products, with a significant portion of the audience being Tori Belle Affiliates. Dkt. # 23 at ¶ 112. Many of the people who left Tori Belle and joined Globallee were part of McKnight's former downline team. Dkt. # 23 at ¶ 123.

> With regards to the other former Affiliate defendants, plaintiff alleges that:
>
> (1) Yocom posted on Facebook that she was terminated with "No warning. No disciplinary action. No conversation. Nothing." but was looking forward to brighter things that she "can't wait to share in due time." Dkt. # 23 at ¶ 101.
>
> (2) Yocom congratulated a former Tori Belle Affiliate on her success with Globallee, stating that there were "[s]o many more to come." Dkt. # 23 at ¶ 118.

Plaintiff further alleges on information and belief that the majority of the communications that constitute unlawful solicitation "occurred *not* in public Facebook posts like those excerpted [in the Second Amended Complaint], but rather via Facebook DMs and messenger groups, private and secret Facebook groups of which Defendants or any of them are admins, text message and email communications, phone calls, and video chats." Dkt. # 23 at ¶ 124 (emphasis in original). There is evidence that the repeated communications had an impact on Tori Belle Affiliates. Within weeks of announcing their affiliation with Globallee, McKnight, Yocom, and Miraya achieved "Emerald Executive," "Senior Team Leader," and "Team Leader" status within the Globallee system. Dkt. # 23 at ¶¶ 129-30. Achieving these bench marks required an entire team of recruits, recruits who, plaintiff alleges, were stolen from Tori Belle. Dkt. # 23 at ¶¶ 69, 128, 132, and 134.

ORDER - 7

Section 5.4 prohibits recruitment, which it defines as, *inter alia*, the "enrollment, encouragement, or effort to influence in any other way, either directly, indirectly, or through a third party" other Affiliates or customers to participate in or patronize another direct sales network marketing venture. Dkt. # 23-3 at 32; Dkt. # 23-4 at 32. The allegations regarding the conduct of McKnight, Yocom, and Miraya regarding the tenor of their communications and the meteoric growth of their Globallee teams are sufficient to raise a plausible inference that they ran afoul of the nonsolicitation agreement set forth in Section 5.4 of the Affiliate Agreement. With regards to Burdine, however, the statement "I feel it in my bones ♥ good things come to those who wait," standing alone, cannot reasonably be read as a solicitation for others to do anything. Nor are there any factual allegations suggesting that Tori Belle Affiliates responded to the message as if it were a solicitation: Burdine's rise through the Globallee ranks appears to have been less spectacular than the others and in keeping with what could be expected from any distributor. The nonsolicitation claim against Burdine fails under *Twombly*.

**2. Confidential and Proprietary Information**

Section 11 of the Affiliate Agreement designates as confidential, *inter alia*, contact information regarding customers, any and all information regarding Affiliates (including their upline and downline affiliations), business materials, promotions, compensation plans, and all information contained in a password protected area of Tori Belle's website (including training materials). Dkt. # 23-3 at 39-40; Dkt. # 23-4 at 39-40. The contract prohibits Affiliates from disclosing confidential information to third parties, using the information to compete with Tori Belle, or using the information to convince an Affiliate or Customer to alter their business

ORDER - 8

relationship with Tori Belle. Dkt. # 23-3 at 40; Dkt. # 23-4 at 40. Plaintiff alleges that one or more of the defendants used and retained its trade secret training materials for selling false eyelash products via direct marketing. Dkt. # 23 at ¶¶ 32 and 94-95. Plaintiff also alleges on information and belief that its former Affiliates used Tori Belle's trade secret contact lists to target Tori Belle Affiliates and customers for Globallee. Finally, it alleges that defendants were privy to Tori Belle "product plans, upcoming initiatives, and financials" and that Globallee launched a lash product shortly after defendants joined the company. Dkt. # 23 at ¶¶ 80, 120, and 136-38.

Defendants argue that Tori Belle's proprietary training materials have not been kept in confidence and therefore cannot be the basis of a breach of confidentiality claim. In particular, defendants assert that Tori Belle allows its Affiliates to publish the training materials on their Facebook pages. Plaintiff generally alleges that it allows high-level Affiliates to publish the proprietary training materials in private Facebook training groups established to train their downline organizations. Dkt. # 23 at ¶¶ 36-38. When evaluating whether confidentiality has been maintained, the distinction between public and private Facebook pages can be important. Facebook allows users to control the audience that gets to see their posts and messages. While a user may opt to have all of his or her information and communications open to the public, the user may also choose to have a particular communication seen by only selected individuals, by only those whom they have accepted as friends, or by only those who have been admitted into a private group. Courts have evaluated the actual selections made and the nature of the communications when determining whether confidences were adequately maintained (*Finder v.*

ORDER - 9

*Leprino Foods Co.*, No. 1:13-CV-2059-AWI-BAM, 2017 WL 1272350, at *6 (E.D. Cal. Jan. 20, 2017)) and have allowed suits to proceed based on allegations that a user's privacy choices have been circumvented (*Jackson v. Amazon.com, Inc.*, No. 20-CV-2365-WQH- BGS, 2021 WL 4197284, at *1 (S.D. Cal. Sept. 15, 2021) (Amazon.com allegedly spying on members of a private Facebook group); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 838–39 (N.D. Cal. 2014) (challenging Facebook's scanning of "private" messages)).

With regards to the defendants named in this case, plaintiff alleges that McKnight administered "Kicking Lashes and Taking Names," a private Facebook group which was used for training purpose, and that the training materials published to the group were therefore maintained in confidence. Dkt. # 23 at ¶¶ 39, 83, and 136. The conclusion does not follow from the premise, however. The Kicking Lashes Training Group was not limited to Tori Belle Affiliates who had agreed to keep the training materials confidential. Plaintiff specifically alleges that the group was made up of "Tori Belle Affiliates and other members of the Tori Belle Community." Dkt. # 23 at ¶ 83. It has not, therefore, raised a plausible inference that the training materials were kept in confidence, nor has it alleged that Yocom, Miraya, or Burdine disclosed or otherwise published the materials in breach of the confidentiality agreement.

With regards to Tori Belle's Affiliate, customer, and prospective customer lists, defendants assert that Tori Belle has not maintained the lists in confidence and that their publication or use could not, therefore, cause any injury. In particular, defendants assert that Tori Belle allowed its Affiliates to publish the lists on their Facebook pages. Dkt. # 30 at 8. But that is not what plaintiff alleges in the Second Amended Complaint. Rather, plaintiff alleges that

ORDER - 10

the contact lists are stored in a password-protected "Backstage" of Tori Belle's website to which only registered Tori Belle Affiliates (*i.e.*, those who are contractually bound to keep the information confidential) are given access. Dkt. #23 at ¶ 42. The proprietary lists contain the names, addresses, phone numbers, and email addresses of Affiliates and customers, customer order histories, the Affiliates' sales figures and commissions, and the upline and downline lineages of each Affiliate. Dkt. # 23 at ¶ 41. Defendants' Facebook pages, on the other hand, disclosed only the names of friends and followers in an undifferentiated mass. *See* Dkt. # 23 at ¶ 10 (noting that defendants' social media channels reached "their significant following of Tori Belle affiliates, customers, and other enthusiasts"). While certain confidential information could be gleaned by reading defendants' posts and the responses thereto, the fact that bits and pieces of a contact list may be publicly available does not destroy the confidentiality of a compilation that includes the public data along with proprietary information. Plaintiff has plausibly alleged that McKnight accessed and used the confidential compilations stored on plaintiff's website to swell the ranks of Globallee distributors. Dkt. # 23 at ¶ 121 ("McKnight accessed the Backstage area of Tori Belle's website seven times on the date of her termination and again on January 12, 2021 – ***five days after she was terminated*** when there was no legitimate reason for her to access Backstage data." (emphasis in original)). With regards to Yocom, Miraya, and Burdine, however, plaintiff does not allege that they did anything more than use their Facebook pages to communicate with friends and followers. Such use disclosed no confidences. Even if the Court assumes that Yocom, Miraya, and Burdine were "Affiliates with large downline networks" who "set their Facebook privacy settings to ensure the privacy of their friends and followers lists"

ORDER - 11

(Dkt. # 23 at ¶ 47), the friends and followers include people who were not obligated to keep the information confidential, such as customers, sales leads, and "Affiliate-recruit leads" (Dkt. # 23 at ¶ 44).

Finally, plaintiff alleges that its former Affiliates were privy to high-level corporate discussions regarding product plans, upcoming initiatives, and financials. Dkt. # 23 at ¶ 80. Plaintiff argues that defendants' access to this information coupled with Globallee's release of a competing eyelash product shortly after defendants joined Globallee "is troubling" and "compel[s] an inference of wrongdoing." Dkt. # 29 at 16. The Court disagrees. Plaintiff specifically alleges that, shortly after defendants left Tori Belle, "social media influencer and entrepreneur Natalie Sorensen announced in a Facebook Live video . . . that she had sold her 'Stand Out' beauty brand," including false eyelashes. Dkt. # 23 at ¶ 115. Plaintiff further alleges that Globallee relaunched the "Stand Out" false eyelash product. Dkt. # 23 at ¶¶ 135 and 138. In light of the allegations of the Second Amended Complaint, plaintiff's theory that defendants utilized Tori Belle's product plans or upcoming initiatives to assist Globallee in the launch of its "Stand Out" line is nothing more than unsupported conjecture.

Taken as true, the allegations of the Second Amended Complaint adequately state a breach of the confidentiality provisions of the Affiliate Agreement only as to McKnight's alleged use and/or disclosure of the proprietary contact lists.

**3. Nondisparagement**

Section 2.13 of the Affiliate Agreement governs Affiliate conduct and precludes Affiliates from making disparaging remarks to any member of the public regarding Tori Belle or

ORDER - 12

any personnel associated with the company. "Disparaging remarks" is defined to include "any unfavorable remarks regarding Company, Company products or Company services or any unfavorable remarks regarding the Company business opportunity, support, earning potential, reputation or image . . . ." Dkt. # 23-1 at 42. To the extent the remarks about which plaintiff complains were made after defendants were no longer Affiliates, there is no language in Section 2.13 suggesting that the provision survives the termination of the contract. The promises and obligations set forth in the agreement are generally undertaken "[a]s an independent Affiliate" (Dkt. # 23-1 at 36), and Section 16 of the agreement specifies that its term is month-to-month (Dkt. # 23-1 at 74). Where a promise extends beyond the termination of the Agreement, such as in the case of the nonsolicitation provision, the contract specifies the applicable post-termination period. *See* Dkt. # 23-1 at 64. No such language is included in Section 2.13.

With regards to defendant McKnight, plaintiff alleges on information and belief that her posts in the Kicking Lashes Training Group at the end of her association with Tori Belle "disparaged Tori Belle in veiled or coded terms," inviting, intending, and provoking negative and vitriolic comments regarding Tori Belle, Tori Belle's executives, and other Affiliates. Dkt. # 23 at ¶¶ 84-86. Plaintiff also alleges on information and belief that McKnight directly disparaged other Affiliates and Tori Belle corporate employees. Dkt. # 23 at ¶ 89. Taken in the light most favorable to plaintiff, it has plausibly alleged a breach of the nondisparagement provision of the Affiliate Agreement as to McKnight.

ORDER - 13

**B. Tortious Interference with Contract or Business Expectancy (Count II)**

Plaintiff alleges that the former Affiliate defendants tortiously interfered with its contracts and prospective business expectancies. The contract claim is based on "contracts with various Affiliates as well as contracts for sale with various customers." Dkt. # 23 at ¶ 153. The business expectancy claim is based on Tori Belle's anticipation that its Affiliate network would keep expanding and its sales would increase. Dkt. # 23 at ¶ 154. Defendants argue that these claims fail because they are simply an end run around Washington's noncompetition statute, which makes noncompetition clauses unenforceable unless the independent contractor earns at least $250,000 per year. RCW 49.62.090(1)(a) provides that the noncompetition statute "displaces conflicting tort, restitutionary, contract, and other laws of [Washington] state pertaining to liability for competition by employees or independent contractors . . . ." Plaintiff cannot, therefore use its tortious interference claim to pursue the unenforceable noncompetition covenant. It may, however, base its tortious interference claim on allegations that defendants McKnight, Yocom, and Miraya interfered with plaintiff's contracts with other Affiliates when they solicited their participation in the Globallee venture and caused them to terminate their agreements with Tori Belle.[3]

In order to state a plausible tortious interference claim, plaintiff must allege "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or

---

[3] As discussed above, plaintiff has not pled sufficient facts to raise a plausible inference that Burdine solicited Tori Belle Affiliates to leave Tori Belle and join Globallee.

ORDER - 14

termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage. *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wash. 2d 133, 157 (1997).[4] Plaintiff has adequately alleged the existence of contracts with Affiliates (in the form of the Affiliate Agreements), that defendants knew of those contracts, that McKnight, Yocom, and Miraya nevertheless encouraged other Affiliates to terminate those contracts and join Globallee in violation of their nonsolicitation provision, and that the resulting defections caused plaintiff a substantial loss of revenue. Defendants have not attempted to show that their conduct was justified or privileged.

To the extent the interference claims are based on plaintiff's loss of new Affiliates and/or the loss of existing or new customers, the analysis is less straightforward. Plaintiff does not argue that it had contracts for the purchase of false eyelashes with which defendants interfered, but rather that it expected future business from existing customers. Similarly, plaintiff does not allege that it had any sort of contractual right to new Affiliates or their sales, but rather that it anticipated that it would benefit from recruiting new Affiliates and making additional sales through them. "A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Newton Ins. Agency & Brokerage, Inc. v.*

---

[4] The Washington Supreme Court had previously established a four element analysis, omitting the "improper purpose or improper means" element and instead shifting the burden to defendants to show that its interference was justified or privileged if plaintiff established the other four elements. *Pleas v. City of Seattle*, 112 Wn.2d 794, 800-01 (1989) (en banc) (quoting *Calborn v. Knudtzon*, 65 Wn.2d 157, 162-63 (1964)). Regardless whether improper purpose/means is an element of the claim or an affirmative defense, plaintiff's pleading is sufficient.

ORDER - 15

*Caledonian Ins. Grp., Inc.*, 114 Wn. App. 151, 158 (2002). Although an enforceable contract is not required to support a tortious interference claim, plaintiff must allege "a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition." *Scymanski v. Dufault*, 80 Wn.2d 77, 84-85 (1971). "Courts allow tortious interference claims where a defendant's acts destroy a plaintiff's opportunity to obtain prospective customers. Washington courts require a plaintiff to show only that its future business opportunities are a reasonable expectation and not merely wishful thinking." *Greensun Grp., LLC v. City of Bellevue*, 7 Wn. App. 2d 754, 768-69 (2019). Read in the light most favorable to plaintiff, the Second Amended Complaint adequately alleges a valid business expectancy. Plaintiff was a fully functional venture with existing customers, a sales track record, and reasonable expectations for the growth of its business which were allegedly not met because of McKnight, Yocom, and Miraya's interference.

Interference is intentional under the third element of a tortious interference claim "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Newton Ins. Agency*, 114 Wn. App. at 158. "Interference is for an improper purpose if it is wrongful by some measure beyond the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1188–89 (W.D. Wash. 2019). Merely "[a]sserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose" (*Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 12 (1989)), but plaintiff has alleged that the

ORDER - 16

means McKnight, Yocom, and Miraya employed – namely the solicitation of both plaintiff's sales force and its customers – was wrongful under the Affiliate Agreement. Plaintiff has, therefore, adequately alleged tortious interference with business expectancy as to those three defendants.

**C. Conversion Against McKnight (Count III)**

Plaintiff alleges that it has a property interest in the Kicking Lashes Training Group, the private Facebook group McKnight developed on Tori Belle's behalf. Dkt. # 23 at ¶ 164. Pursuant to Section 2.10 of the Affiliate Agreement, McKnight was expected to "share [her] experiences in sales techniques, product knowledge, and understanding of the Tori Belle Cosmetic's program] with lesser experienced Affiliates within [her] organization" and was required to "establish[] a venue for group communication such as a Facebook group, messenger group, email thread, etc. and respond[] to those communications in a positive and helpful manner." Dkt. # 23-3 at 8; Dkt. # 23-4 at 8. Elsewhere, McKnight acknowledged that "[a]ny and all information regarding Affiliate's Personal Team, Affiliate's Downline, and Affiliate's Upline" was confidential and would not be used "for any reason other than for pursuing [the Affiliate's] Tori Belle Business." Dkt. # 23-3 at 39; Dkt. # 23-4 at 39. Plaintiff alleges that, following her departure from Tori Belle, McKnight kicked out those administrators of the Kicking Lashes Training Group who remained loyal to Tori Belle, effectively hijacking a forum that had been developed as a Tori Belle asset and converting it into her own personal property

ORDER - 17

or, Tori Belle fears, into a Globallee recruiting and training site.[5] The conversion claim is not based on McKnight's retention of her own Facebook profile, friends, and followers, but rather on her refusal to turn over the administrative keys to a private Facebook group she had developed on plaintiff's behalf. Plaintiff has adequately alleged conversion as to McKnight.

**D. Defend Trade Secrets Act (Count IV)**

The Defend Trade Secrets Act confers a private cause of action on "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Misappropriation is defined to include "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . ." 18 U.S.C. § 1839(5). Plaintiff alleges that it is the owner of a training program and contact lists that are related to false eyelashes, the sale of which generates millions of dollars in revenue. Dkt. # 23 at ¶¶ 171-72. Plaintiff further alleges that it has taken reasonable efforts to maintain the secrecy of this information through the use of nondisclosure and confidentiality agreements, password-protected access, and closed/private group training sessions. Dkt. # 23 at ¶ 173.

---

[5] Defendants assert that McKnight has deactivated the Facebook group as required by Section 4 of Tori Belle's Policies and Procedures, Dkt. # 23-2 at 14. Plaintiff alleges, however, that McKnight has used the private Facebook group to recreate or resurrect a new training group for Globallee. Dkt. # 23 at ¶¶ 110 and 124. Taking the allegations in the light most favorable to plaintiff, the claim of conversion is adequately plead.

ORDER - 18

As discussed above, however, plaintiff has not raised a plausible inference that the training materials were kept in confidence. Plaintiff has, however, adequately alleged that McKnight used its trade secret contact lists in service of Globallee, causing plaintiff financial harm, despite having agreed that the information was confidential and that she owed a duty to maintain the secrecy of the information. Notwithstanding defendants' arguments that McKnight did not misappropriate contact lists and that plaintiff has not shown damages, the Court finds that plaintiff has adequately alleged a Defense of Trade Secrets Act violation against McKnight.[6]

**E. Civil Conspiracy (Count V)**

Defendants argue that Tori Belle's conspiracy claim "fails for the same reasons Tori Belle's [] tortious interference claims fail: the non-compete and non-solicitation provisions are unenforceable under Washington law." Dkt. # 26 at 29. For the reasons discussed above, however, plaintiff's nonsolicitation claim against McKnight, Yocom, and Miraya survives defendants' motion to dismiss. Plaintiff's allegations of a related conspiracy among all four defendants are sufficient under *Twombly*.

**F. Duty of Good Faith and Fair Dealing (Count VI)**

Plaintiff alleges that McKnight breached the implied duty of good faith and fair dealing by intentionally eliciting disparaging statements/comments from third parties in response to her

---

[6] To the extent defendants are arguing that plaintiff must show that they acquired the trade secrets through improper means, they are mistaken. The definition of misappropriation covers a wide array of conduct. Here, plaintiff has adequately alleged that McKnight, being fully aware of her contractual obligations, used plaintiff's Affiliate and customer lists without permission and for the benefit of a competitor.

ORDER - 19

Facebook posts. Dkt. # 23 at ¶ 196. McKnight argues that she abided by her contractual duties not to disparage Tori Belle and, therefore, "[t]he implied duty claim should also be dismissed with prejudice." Dkt. # 26 at 20. As discussed above, however, plaintiff has adequately alleged a disparagement claim against McKnight, and if plaintiff can show that she prompted others to disparage Tori Belle, she may further have deprived plaintiff of the benefit of the nondisparagement bargain.

For all of the foregoing reasons, defendants' motion to dismiss (Dkt. # 26) is GRANTED in part and DENIED in part. Plaintiff's nonsolicitation claim against Burdine, the confidentiality claim against Yocom, Miraya, and Burdine, the tortious interference claim against Burdine, and the Defend Trade Secrets Act claim against Yocom, Miraya, and Burdine are hereby DISMISSED.

Dated this 31st day of August, 2022.

*MWS Lasnik*
Robert S. Lasnik
United States District Judge

ORDER - 20